**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| GENERAL ELECTRIC CAPITAL CORP., | |
| Plaintiff, | No. C 06-33-MWB |
| vs. | **MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTS AND BUSINESS RELATIONS** |
| COMMERCIAL SERVICES GROUP, INC., | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

*I.  INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    *A.  Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    *B.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
    *A.  Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . . . .  11
    *B.  Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
        *1.  GE Capital's initial argument* . . . . . . . . . . . . . . . . . . . .  13
        *2.  CSG's response* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
        *3.  GE Capital's reply* . . . . . . . . . . . . . . . . . . . . . . . . . . .  16
    *C.  Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
    *D.  Wrongfulness* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
        *1.  The difference between and overlap of the standards* . . . . . .  19
        *2.  Application of the lower standard* . . . . . . . . . . . . . . . . . .  22
        *3.  Application of the higher standard* . . . . . . . . . . . . . . . . . .  26
    *E.  GE Capital's Liability For Actions Of CSG's Replacement* . . . . . . . .  27

*III.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

C an a debt collection service pursue its claim for tortious interference with existing and prospective contracts and business relationships based on circumstances surrounding a client corporation's termination of the parties' contract? On a motion for partial summary judgment on the debt collection service's tortious interference counterclaim, the client corporation asserts that, at least in this case, the answer is no. The client corporation argues that it could not interfere with its own contract or any purported contracts that its related entities may have had with the debt collection service, the debt collection service has not shown that it had any reasonable likelihood of prospective business relations with any of the debtors from whom it was trying to collect on the client corporation's behalf, and the debt collection service has not shown that the client corporation acted for any reason other than to protect its own legitimate interests. The debt collection service vehemently disagrees. The question, however, is whether the debt collection service has generated genuine issues of material fact on the challenged elements of its tortious interference counterclaim.

## I. INTRODUCTION

### A. Factual Background

The court will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, the court will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the plaintiff's motion for partial summary judgment on the defendant's counterclaim for tortious

2

interference with existing an prospective contracts and business relationships.[1]  The court will then discuss specific factual disputes, and the extent to which they may be material, in the context of pertinent portions of its legal analysis.

The parties agree that plaintiff General Electric Capital Corporation (GE Capital) is a corporation organized and existing under the laws of the State of New York with its principal place of business in Stamford, Connecticut.  They also agree that defendant Commercial Services Group, Inc. (CSG), is a corporation organized and existing under the laws of the State of Kentucky with its principal place of business in Louisville, Kentucky. The GE Capital office that dealt with CSG, however, is located in Cedar Rapids, Iowa, thus explaining the connection between the parties' dispute and this forum.

On June 23, 2000, GE Capital and CSG entered into a Collection Agreement pursuant to which CSG agreed to collect delinquent accounts from GE Capital customers and, after receiving a commission, to forward the proceeds to GE Capital.  The Collection Agreement had the following pertinent provisions concerning "recall" of accounts placed by GE Capital with CSG for collection:

> 2.4    RECALL.
>
> > (a) Notwithstanding any provision herein to the contrary, GE Capital shall have the absolute right to recall any Account placed with Contractor any time, for any reason, in its sole discretion, with or without cause. Each Account so recalled shall be a "Recalled Account." Any Account placed with Contractor in

---

[1]Indeed, the court finds that some of the information necessary or helpful to understand the context for the plaintiff's motion for partial summary judgment on the defendant's counterclaim for tortious interference cannot be found in either party's appendix.  Thus, where possible, the court has looked to other submissions of the parties for such information.

respect to which no payment has been received by either Contractor or GE Capital by the automatic recall date specified on Schedule A shall be automatically deemed a Recalled Account as of the automatic recall date specified on Schedule A. With respect to any Recalled Account, Contractor shall (i) immediately close its file, (ii) not take any further action with respect to such Recalled Account, (iii) immediately return to GE Capital all copies of documents forwarded by GE Capital to Contractor, and (iv) if Contractor receives any payment on any Recalled Account thereafter, Contractor shall remit such payment immediately, and in like kind, to GE Capital.

(b) GE Capital, in its sole discretion, may place Recalled Accounts with any other Person. Contractor [CSG] shall not be entitled to any Commission or other compensation as a result of any payment received by GE Capital, Contractor or any other Person in respect of a Recalled Account if such payment is received on or after the date that such Account constitutes a Recalled Account.

Defendant's Appendix at 19 (Defendant's Exhibit G, Collection Agreement at 5, § 2.4).[2]

In addition, the Collection Agreement contains the following pertinent provisions concerning "termination" of the Agreement:

---

[2]Surprisingly, the Collection Agreement is not attached to GE Capital's Complaint or Amended Complaint and is not included in GE Capital's minimal Appendix in support of its Motion For Partial Summary Judgment, although some of the pertinent portions of the Collection Agreement are included in GE Capital's Statement Of Undisputed Facts In Support Of Motion For Partial Summary Judgment (docket no. 17). A complete copy of the Collection Agreement is found in CSG's Appendix. Therefore, the court has cited to that complete copy.

4

7.1     <u>TERM; TERMINATION</u>. This Agreement may be terminated at any time by either party upon thirty (30) days prior written notice to the other. This Agreement may also be terminated by GE Capital immediately upon the occurrence of any Event of Default pursuant to Section 8.1.

7.2     <u>ACTIONS UPON TERMINATION</u>. Upon termination of this Agreement, all Accounts placed with Contractor shall immediately be deemed Recalled Accounts, and shall be subject to the provisions of Section 2.4. In addition:

(i)     Contractor shall promptly render an accounting to GE Capital on each such Account;

(ii)     If Contractor receives any payment on any Account thereafter, Contractor shall remit such payment immediately, and in like kind, to GE Capital;

(iii)     Contractor shall, at GE Capital's request, notify Account Debtors that all payments should be made to GE Capital (or such other person as GE Capital may designate; and

(iv)     Contractor shall use best efforts to otherwise cooperate with and assist GE Capital in connection with establishing the mechanisms, systems and procedures necessary for GE Capital (or any contractor retained by or on behalf of GE Capital) to efficiently and properly take over the functions performed thereunder.

Defendant's Appendix at 29-30 (Defendant's Exhibit G, Collection Agreement at 15-16, §§ 7.1-7.2). The "Event of Default" identified in § 7.1 as a ground for immediate

Case 1:06-cv-00033-MWB   Document 36   Filed 04/26/07   Page 5 of 30

termination of the Collection Agreement is identified as "non-performance" and defined, further, as the following:

> Failure of the Contractor to perform any term, covenant or condition contained in this Agreement, including, without limitation, timely remittances and payments to the Customer Support Center of amounts owed to GE Capital, compliance with Applicable Law, compliance with the policies and procedures required thereunder, and the maintenance of insurance and bonds required hereunder.

Defendant's Appendix at 30 (Defendant's Exhibit G, Collection Agreement at 16, § 8.1).

The parties agree that GE Capital sent CSG a letter dated May 27, 2005, as a Notice of Termination Of Contract, effective June 26, 2005. The parties apparently dispute, however, whether the termination of the Collection Agreement was with or without cause, and hence, whether the Notice provided for immediate termination or termination after thirty days. *See* Collection Agreement, § 7.1 (providing that the Agreement could be terminated "at any time" on thirty days notice or "immediately" upon the occurrence of any "Event of Default" pursuant to § 8.1). Indeed, CSG disputes whether the Collection Agreement was properly terminated. Neither party has submitted a copy of the Notice of Termination as part of the summary judgment record, nor provided that Notice as an attachment to any other pleading or submission, nor quoted, in any submission, any specific language of that Notice that might be pertinent to the determination of the nature of or basis for the purported termination of the Collection Agreement. The parties agree that, after receiving the Notice of Termination, CSG provided GE Capital with a check for $19,413.56 that apparently represented proceeds of collection activities. GE Capital contends that this check was insufficient, because according to GE Capital, CSG's records suggest that CSG should have paid over more than $500,000.00 to GE Capital upon termination of the Collection Agreement. Although this dispute over what CSG owed GE

Capital upon termination of the Collection Agreement is the focus of GE Capital's action for breach of contract and account, it is not the focus of the present ruling. Rather, a dispute over GE Capital's conduct after terminating the Collection Agreement, giving rise to CSG's claim of tortious interference with existing and prospective contracts and business relationships, is the central focus of this ruling.

As to the pertinent conduct, the parties apparently agree that, on June 13, 2005, GE Capital sent a letter to past and present GE "business partners" on GE Commercial Finance letterhead informing each recipient "that Commercial Services Group (CSG) is no longer authorized to collect on behalf of GE," adding "Please direct all questions to Coastal Recovery Corporation at (800) 431-2833," and "Please remit any payment to Coastal Recovery Corporation, 180 South Broadway, White Plains, NY 10605."[3] The parties have not cited any provision of the Collection Agreement that either permits or prohibits notification of third parties of the termination of the Collection Agreement, but CSG nevertheless argues that the June 13, 2005, letter tortiously interfered with its contracts and business relationships. In answers to interrogatories and again in its brief, CSG also asserts that Coastal Recovery Corporation, the entity hired by GE Capital to pursue collection of delinquent accounts after GE Capital terminated the Collection Agreement with CSG, has, at various times, told past and present GE business partners

---

[3]Again, surprisingly, neither party has made a copy of the June 13, 2005, letter a part of the record in this case, although they agree that CSG has cited the quoted statements from that letter in response to interrogatories as the basis for CSG's tortious interference counterclaim. *See* Plaintiff's Statement Of Undisputed Facts (docket no. 17) at ¶ 14 (citing CSG Answer to Interrogatory No. 8, and Plaintiff's Appendix at 6-7); Defendant's Response To Plaintiff's Statement Of Undisputed Facts at 14 (identifying this correspondence as "one of the bases of CSG's counter-claim," but not identifying any other basis).

7

that any contact from CSG after May 27, 2005, was "improper," that there was no guarantee that payments sent to CSG after that date would be properly applied to a business partner's account, and that CSG had failed to remit properly all funds owed to GE Capital.

CSG contends in its resistance to the motion presently before the court that, by sending the June 13, 2005, letter and by allowing or authorizing Coastal Recovery Corporation to "disparage" CSG, GE Capital has interfered with established contractual relations with GE business entities. In response to interrogatories, CSG represents that it had written contractual relationships with individual persons, firms, and corporations doing business with GE entities or that had previously done business with GE entities arising from letters sent and received by CSG; that it had prospective business relations with every GE entity on whose behalf it attempted to collect a debt and every GE "business partner" from whom it attempted to collect a debt owed to GE; and that it had enormous earnings potential from these various entities, from both commissions earned via successful collections and future earnings to be realized when the entities contracted with CSG to perform the same services on their behalf. Somewhat more specifically, in its brief and in answers to interrogatories found in the parties' appendices, CSG represents that it had been employed by GE entities to pursue collection of 84 separate and distinct portfolios of GE accounts receivable totaling 26,924 past and present "GE business partners" and that GE Capital interfered with existing or prospective business relationships arising from each of these portfolios or accounts. None of the contracts or letters sent and received by CSG that CSG argues established existing or prospective contractual relationships, however, can be found in the summary judgment record.

8

### B.  Procedural Background

GE Capital initiated this lawsuit by filing its original Complaint (docket no. 2) on March 10, 2006, but then filed an Amended Complaint (docket no. 9) on April 6, 2006, before any answer was received.  As amended, GE Capital's Complaint alleges that, after receiving the May 27, 2005, letter terminating the parties' Collection Agreement, and after some resistance and continued attempts to collect funds, CSG finally stopped attempting to collect funds on GE Capital's delinquent accounts.  GE Capital alleges, further, that CSG has, despite repeated demands, refused to perform its obligations under Section 7.2 of the Collection Agreement and has damaged GE Capital, *inter alia*, by remitting only approximately $19,000 out of an amount due substantially in excess of $500,000.  As relief for CSG's breach of contract, GE Capital requests entry of judgment for the full amount of payments due to GE Capital from CSG under the Collection Agreement and declaratory judgment pursuant to 28 U.S.C. § 2201 in favor of GE Capital to the effect that CSG must promptly render an accounting to GE Capital on each account assigned to it for collection as required by Section 7.2(i) of the Collection Agreement.

On May 2, 2006, CSG filed its Answer To Amended Complaint And Counter-Claim Of Defendant (docket no. 13).  Therein, CSG denies GE Capital's breach-of-contract claim asserts various affirmative defenses, and asserts counterclaims for "breach of contract" and "tortious interference."  Only the latter counterclaim is at issue for present purposes.  That counterclaim alleges that CSG had established contractual relationships and prospective business relationships with numerous delinquent customers of GE Capital, as well as established contractual relationships with other companies, including companies "related to" GE Capital, and that GE Capital had knowledge of these contractual relationships and prospective business relationships.  CSG alleges, further, that GE Capital purposefully interfered with these contractual and prospective relationships in the following ways:  (1)

9

"by notifying all CSG customers with delinquent GE Capital accounts to cease doing business with CSG while the contract between GE Capital and CSG was still in effect"; and (2) "by notifying other customers of CSG, including related GE Capital companies, to cease doing business with CSG." Answer and Counterclaims, ¶¶ 11-12. CSG alleges that GE Capital acted with intent to injure CSG—and, indeed, acted with malice and/or reckless disregard for CSG's rights—when it interfered with CSG's existing and prospective business relationships, and that GE Capital's conduct has injured CSG in the form of lost benefits of the relationships. CSG seeks actual and punitive damages, attorney fees and costs, and such other relief as may be just and equitable under the circumstances for GE Capital's tortious interference. GE Capital filed an Answer to Counterclaim (docket no. 15) on May 24, 2006, denying both of CSG's counterclaims and asserting certain affirmative defenses.

This matter was originally assigned to Judge Linda Reade, now Chief Judge, but on April 3, 2006, it was reassigned to Senior Judge Edward McManus. On March 7, 2007, Judge McManus recused himself, see Order (docket no. 26), and the undersigned was then assigned to the case. This matter has been set for bench trial on September 17, 2007, but CSG recently filed a motion to continue the trial owing to scheduling conflicts. The court will address CSG's motion to continue by separate order.

On October 23, 2006, well before this case was assigned to the undersigned, GE Capital filed its Motion For Partial Summary Judgment On Defendant's Counter-Claim For Tortious Interference With Contract And Business Relations (docket no. 17). CSG filed its Resistance To Plaintiff's Partial Motion [sic] For Summary Judgment (docket no. 20) on December 13, 2006, and GE Capital filed a Reply (docket no. 24) in further support of its motion on December 20, 2006. No party requested oral arguments on GE Capital's Motion For Partial Summary Judgment in the manner required under Local Rules

10

7.1 and 56.1. Therefore, the undersigned has turned to disposition of the motion, on the written submissions, as soon after the case was assigned to him as his schedule has permitted.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. FED. R. CIV. P. 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377.

11

Furthermore, "where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th

12

Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

GE Capital contends that it is entitled to summary judgment under these standards on CSG's counterclaim of tortious interference with existing and prospective contracts or business relations. CSG denies that summary judgment is appropriate on this counterclaim.

## B. Arguments Of The Parties

### 1. GE Capital's initial argument

In its opening brief in support of its motion for partial summary judgment on CSG's tortious interference counterclaim, GE Capital argues that it cannot have interfered with its own contract with CSG, because it is a party, not a stranger, to that contractual relationship. Nor can it have interfered with a contract or business relationship between a "related entity" and CSG, GE Capital argues, particularly where, as here, it has acted to protect its own interests involved in the related entity. Next, GE Capital argues that CSG has not shown that there were any other contracts with which GE Capital has interfered or that GE Capital had any knowledge of any such alleged contracts.

Turning to interference with prospective business relationships, GE Capital argues that CSG has no realistic prospective business relationships, and if CSG did, there is no evidence that GE Capital was aware of any such prospective business relationships. GE Capital argues that CSG must show that such a prospective relationship was "reasonably likely" to produce financial benefits, but that CSG has made no such showing, where it simply is not reasonable to believe that CSG's collection of debts from debtors would lead

13

to business based on CSG's solicitation of those debtors for their future collection business. Thus, GE Capital contends that there are no prospective business relationships that are reasonably likely, no showing that GE Capital knew of any such prospective business relationships, if they existed, and no showing of actual damages to CSG from any alleged interference.

GE Capital also argues that any tortious interference claim fails, because the record shows only that GE Capital acted to protect its own legitimate financial and business interests, and only asserted contract rights in good faith, even if the court ultimately determines that GE Capital was incorrect in its beliefs concerning what was permitted under the parties' contract. Finally, GE Capital argues that it cannot be directly or vicariously liable for any acts of Coastal Recovery Corporation, the company that GE Capital hired to pursue delinquent accounts after terminating its contract with CSG—if CSG is now asserting that Coastal Recovery Corporation's actions support CSG's tortious interference counterclaim against GE Capital—because there are no allegations or evidence that Coastal Recovery Corporation is an entity for which GE Capital would have direct or vicarious liability.

### 2. CSG's response

CSG concedes that a party cannot interfere with its own contract, but contends that GE Capital's assertion of that principle misconstrues CSG's tortious interference counterclaim: CSG contends that the essence of its counterclaim is that GE Capital's actions have affected and will continue to affect CSG's business relationships with third parties. CSG argues that GE Capital has not cited any authority that actually stands for the proposition that a party cannot be liable for tortious interference based on its interference with a "related entity's" contractual or business relationships with a third party. CSG also argues that GE Capital has not presented any facts showing that it owns

14

or exerts sufficient control over any third party or is a third-party beneficiary of such third party's contracts with CSG, such that GE Capital might be able to invoke a parent-subsidiary privilege.

CSG also contends that it has sufficiently alleged numerous contracts with which GE Capital allegedly interfered and that GE Capital had knowledge of such contracts. CSG points out that it has asserted that GE entities were its established clients and that it had 84 portfolios of GE accounts receivable totaling 26,924 GE business partners. CSG argues that "reasonable inquiry" would have revealed the existence of specific contracts, thus satisfying the "knowledge" element of its tortious interference claim.

Next, CSG argues that, as to a claim of tortious interference with a prospective business relationship, particularly intensive fact finding is required to determine the tortfeasor's motive and to determine whether the party claiming injury had a reasonable likelihood of financial benefit from the prospective relationship. For purposes of summary judgment, CSG argues that it has alleged sufficient facts on these issues, including facts that its clients and potential clients were contacted by GE Capital without CSG's permission or knowledge in an attempt to persuade those clients to cease doing business with CSG. CSG specifically points to the June 13, 2005, letter from GE to past and present GE business partners as evidence of GE Capital's improper motives. CSG argues that it would be reasonable to conclude from the nature and substance of GE Capital's contacts with GE Capital's business partners that GE Capital's motive was to injure financially or to destroy CSG, not merely to protect its own financial interests. Indeed, CSG argues that, by "publicly disparaging" CSG across the collection industry, especially to entities that were not yet clients of CSG, GE Capital had to know that it was creating a public perception that no one should conduct business with CSG.

15

Finally, CSG contends that GE Capital could be directly and/or vicariously liable for interference by Coastal Recovery Corporation, because CSG contends that it has produced evidence that GE Capital directed Coastal Recovery Corporation to correspond with current and prospective contacts of CSG for the purpose of disparaging CSG and terminating any relationship those contacts might have with CSG. The nature of the relationship between GE Capital and Coastal Recovery Corporation, CSG argues, is a question of fact that should go to a jury, including the questions of what GE Capital told Coastal Recovery Corporation to do and when GE Capital told Coastal Recovery Corporation to do it. In light of the correspondence that Coastal Recovery Corporation disseminated, CSG argues that a reasonable factfinder could conclude that Coastal Recovery Corporation was an agent of GE Capital.

### 3.    *GE Capital's reply*

In reply in further support of its motion for partial summary judgment on CSG's tortious inteference counterclaim, GE Capital argues that CSG has conceded that GE Capital could not interfere with its own contract and asserts only unspecified fact issues concerning whether or not GE Capital could have interfered with contracts or business relationships between GE Capital's related entities and CSG. Any supposed "interference," however, GE Capital argues, was nothing more than notifying "business partners" and "related entities" that GE Capital was terminating CSG's contract and that CSG was, therefore, no longer authorized to collect debts for GE Capital. GE Capital argues that there was nothing "wrong" in such notifications, but even if such notifications were somehow contrary to terms of the parties' Collection Agreement, then such conduct is only cognizable as a breach of contract, not as tortious interference with a contract or business relationship. Moreover, GE Capital argues that CSG has cited no facts and no

16

authority for the proposition that a debt collector has a prospective business relationship with a debtor from whom it was trying to collect a debt.

### C.  Applicable Law

As this court has observed, under Iowa law,[4]

> [t]he elements of a claim of tortious interference with existing contracts . . . are the following:  (1) the plaintiff had a valid contractual relationship with a third party; (2) the defendant knew of that relationship; (3) the defendant intentionally interfered with that relationship; (4) the defendant's action caused the third party to breach its contractual relationship with the plaintiff or disrupted the contractual relationship between the third party and the plaintiff by making performance more burdensome or expensive; and (5) the amount of damages. *See, e.g., Grimm v. U.S. West Communications, Inc.,* 644 N.W.2d 8, 11-12 (Iowa 2002);

---

[4]The parties do not dispute the applicability of Iowa law to CSG's tortious interference claim.  Indeed, the Collection Agreement expressly states the following:

> 11.2  <u>CHOICE OF LAW</u>.  This Agreement and the rights of the parties under this Agreement shall be governed by governed by [sic], and construed in accordance with the internal laws of the State of Iowa (without regard to the conflict of laws principles of such State), including all matters of construction, validity and performance <u>provided</u>, <u>however</u>, to the extent that the term "Applicable Law" is relevant in determining those rights, such term is intended to refer to all federal, state and local statutes, ordinances, laws, rules and regulations and injunctions and orders applicable to the Accounts, GE Capital, Contractor and otherwise to this Agreement.

Defendant's Appendix at 33 (Exhibit G, Collection Agreement at 19, § 11.2) (emphasis in original).

17

> *Revere Transducers, Inc. v. Deere & Co.,* 595 N.W.2d 751,
> 763 (Iowa 1999). . . . The elements of the tort of interference
> with a prospective business advantage or contractual
> relationship . . . are the following: (1) the plaintiff had a
> prospective contractual or business relationship; (2) the
> defendant knew of the prospective relationship; (3) the
> defendant intentionally and improperly interfered with the
> relationship; (4) the defendant's interference caused the
> relationship to fail to materialize; and (5) the amount of
> resulting damages. *See, e.g., Blumenthal Inv. Trusts v. City
> of West Des Moines,* 636 N.W.2d 255, 269 (Iowa 2001).

*Helm Fin. Corp. v. Iowa Northern Ry. Co.*, 214 F. Supp. 2d 934, 996 (N.D. Iowa 2002)

(citations to California decisions identifying identical elements for the versions of the tort

under California law deleted); *accord Green v. Racing Ass'n of Central Iowa*, 713 N.W.2d

234, 243 (Iowa 2006) (identifying the elements of "intentional interference with an existing

contract" as the following: "(1) plaintiff had a contract with a third-party; (2) defendant

knew of the contract; (3) defendant intentionally and improperly interfered with the

contract; (4) the interference caused the third-party not to perform, or made performance

more burdensome or expensive; and (5) damage to the plaintiff resulted.") (quoting *Gibson

v. ITT Hartford Ins. Co.,* 621 N.W.2d 388, 399 (Iowa 2001), in turn quoting *Jones v.

Lake Park Care Ctr., Inc.,* 569 N.W.2d 369, 377 (Iowa 1997)).

As this court has observed, "[B]oth claims have as an element the impropriety or

wrongfulness of the defendant's conduct. That impropriety or wrongfulness must be by

some legal measure other than the fact of interference itself." *Id.* (internal quotation marks

and citations to California law deleted) (citing *Compiano v. Hawkeye Bank & Trust,* 588

N.W.2d 462, 464 (Iowa 1999), as stating the "impropriety standard for interference with

prospective contracts or business relationships, and RESTATEMENT (SECOND) OF TORTS §

766B cmt. d & § 767); *accord Green,* 713 N.W.2d at 243 (expressly stating the third

Case 1:06-cv-00033-MWB   Document 36   Filed 04/26/07   Page 18 of 30

element of tortious interference with an existing contract as the "defendant intentionally *and improperly* interfered with the contract") (emphasis added). Thus, the court may grant summary judgment on CSG's tortious interference claim, whether the claim relates to existing or prospective contractual or business relationships, if CSG fails to generate genuine issues of material fact that GE Capital's conduct was, in some legal sense "wrongful" apart from the alleged interference. *Id.* (granting summary judgment for the alleged tortfeasor on this ground); *accord Green*, 713 N.W.2d at 243-44 & 246 (same). For the reasons stated below, the court finds that whether or not GE Capital is entitled to summary judgment on CSG's tortious interference counterclaim turns on precisely this "impropriety" or "wrongfulness" issue, so that the court need not consider any of the other challenged elements of CSG's tortious interference counterclaim.

### D. Wrongfulness

#### 1. The difference between and overlap of the standards

The "impropriety" or "wrongfulness" of conduct alleged to be tortious interference is determined according to somewhat different standards, depending upon whether the claim is for tortious interference with an existing contract or for torious inteference with a prospective or potential contract or business relationship. In the case of interference with an *existing* contract, the Iowa Supreme Court has explained,

> The intent to interfere with a contract does not make the interference improper. *Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996) (citing Restatement (Second) of Torts § 767 cmt. d (1979)). The interference must be both intentional and improper. For purposes of a claim for intentional interference with a contract, the factors used to help determine if the challenged conduct was improper include:
> 1. The nature of the conduct.

19

2.      The Defendant's motive.

3.      The interests of the party with which the conduct interferes.

4.      The interest sought to be advanced by the Defendant.

5.      The social interests in protecting the freedom of action of the Defendant and the contractual interests of the other party.

6.      The nearness or remoteness of the Defendant's conduct to the interference.

7.      The relations between the parties.

*Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 767 (Iowa 1999); *accord Restatement (Second) of Torts* § 767, at 26-27.

*Green*, 713 N.W.2d at 744. The required "impropriety" or "wrongfulness" for purposes of a claim of tortious interference with a *prospective or potential* contract or business relationship, however, requires a much more specific showing: that the interfering party "'intended to financially injure or destroy'" the claimant. *See, e.g., Blumenthal Inv. Trusts v. City of West Des Moines*, 636 N.W.2d 255, 269 (Iowa 2001) (quoting *Iowa Coal Mining Co., Inc. v. Monroe County*, 555 N.W.2d 418, 438 (Iowa 1996)); *Compiano v. Hawkeye Bank & Trust,* 588 N.W.2d 462, 464 (Iowa 1999) (a defendant's conduct is improper, for purposes of a claim of interference with a prospective contract or business relationship, only if it is undertaken with "*the sole or predominant purpose* to injure or financially destroy" another, and noting that this requirement distinguishes tortious interference with a prospective business relationship from tortious inteference with an existing contract) (emphasis added). Plainly, if a claimant cannot establish—or here, cannot generate a genuine issue of material fact—that the alleged interference was "improper" under the standards for a claim of tortious interference with an *existing* contract, the claimant has no chance of meeting the higher burden for interference with a

20

*prospective* contract of showing that the alleged interference was intended to financially injure or destroy the claimant. Thus, the crux of GE Capital's motion for summary judgment "boils down to whether there are any facts associated with [CSG's tortious interference claim] from which a rational jury could find intentional and improper interference." *Green*, 713 N.W.2d at 243-44.

In the case of interference with either an existing or prospective contract or business relationship, the conduct was not "improper" if it was merely a consequence of action undertaken for a purpose other than to interfere with a contract. *See id.* at 244 (alleged interference with an existing contract); *Compiano*, 588 N.W.2d at 465 (interference with prospective business relationship). As the Iowa Supreme Court has explained,

> In *Berger*, we quoted from Restatement (Second) of Torts section 767 comment d:
>> "[I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor or motive carries little weight towards producing any determination that the interference was improper."
>
> *Berger*, 543 N.W.2d at 599 (quoting *Restatement (Second) of Contracts* § 767 cmt. d ). Thus, conduct is generally not improper if it was merely a consequence of actions taken for a purpose other than to interfere with a contract. *See id.* ("[A] party does not improperly interfere with another's contract by exercising its own legal rights in protection of its own financial interests." (citing *Wilkin Elevator v. Bennett State Bank*, 522 N.W.2d 57, 62 (Iowa 1994))).

*Green*, 713 N.W.2d at 744; *accord Compiano*, 588 N.W.2d at 466 (also citing *Berger* for this standard on a claim of interference with a prospective business relationship).

21

## 2. *Application of the lower standard*

CSG argues that, on a tortious interference claim, particularly intensive fact finding is required to determine the tortfeasor's motive. Even so, CSG argues that it has alleged sufficient facts on the "impropriety" issues, including facts that its clients and potential clients were contacted by GE Capital without CSG's permission or knowledge in an attempt to persuade those clients to cease doing business with CSG. CSG specifically points to the June 13, 2005, letter from GE Capital to past and present GE business partners as evidence of GE Capital's improper motive, because CSG contends that the nature and substance of that letter shows that GE Capital's motive was to financially injure or destroy CSG, not merely to protect GE Capital's own financial interests. Indeed, CSG characterizes that letter as part of GE Capital's "public disparagement" of CSG. These arguments notwithstanding, the court finds that, under the applicable standards, CSG has failed to generate genuine issues of material fact on the "impropriety" of GE Capital's conduct.

First, the "nature" of GE Capital's conduct is not, in itself, wrongful, as that conduct "advanced" legitimate "interests" of GE Capital. *See Green*, 713 N.W.2d at 744 (the factors for determining whether conduct was "improper" include "[t]the nature of the conduct" and "[t]he interest sought to be advanced by the Defendant"). CSG cannot dispute that GE Capital was entitled to terminate the Collection Agreement at any time, with or without cause. *See* Collection Agreement (Defendant's Exhibit G), § 7.1 ("This Agreement may be terminated at any time by either party upon thirty (30) days prior written notice to the other. This Agreement may also be terminated by GE Capital immediately upon the occurrence of any Event of Default pursuant to Section 8.1."). Although CSG argues that nothing in the parties' Collection Agreement authorized GE Capital to notify others of the termination of the contract, CSG has, likewise, pointed to

22

nothing that prohibited GE Capital from notifying parties affected by the termination of the Collection Agreement of the termination, so that the "nature" of the conduct of notifying third parties was not "wrongful" under the terms of the contract or otherwise. CSG has also failed to show that the social interest in protecting GE Capital's freedom of action, specifically, freedom to terminate its contract with CSG and to notify affected third parties of that decision, is outweighed by any countervailing contractual interest of CSG barring disclosure of the termination of the contract to affected third parties, where no term of the parties' contract barred disclosure of the termination to affected third parites. *Green*, 713 N.W.2d at 744 (also considering "[t]he social interests in protecting the freedom of action of the Defendant and the contractual interests of the other party").

It is true that the June 13, 2005, letter that is the focus of CSG's tortious interference claim does direct GE Capital's "business partners" to remit payments to an entity other than CSG, and to that extent, it may have interfered with CSG's interest in its income stream and CSG's interest in relationships with entities from whom and on behalf of whom CSG was attempting to collect debts. *See Green*, 713 N.W.2d at 744 (considering as another factor "[t]he nearness or remoteness of the Defendant's conduct to the interference" and "[t]he interests of the party with which the conduct interferes"). However, redirecting payments to a different entity upon termination of a contract with a prior entity simply advances the redirecting party's own financial interests in the flow of payments through the correct entity, so that the "nature" of the conduct was not improper. *Berger*, 543 N.W.2d at 599 ("[A] party does not improperly interfere with another's contract by exercising its own legal rights in protection of its own financial interests.") (citing *Wilkin Elevator*, 522 N.W.2d at 62); *see also Green*, 713 N.W.2d at 744 (in addition to "[t]he nature of the conduct," a pertinent factor is "[t]he interests sought to be advanced by the Defendant"). Indeed, CSG has not pointed to any record evidence

23

demonstrating that the parties' relationship had become so hostile that there might be an inference of improper retaliation in GE Capital's termination of the Collection Agreement or GE Capital's notice to third parties that GE Capital had terminated the Collection Agreement. *See Green*, 713 N.W.2d at 744 (considering the "relations between the parties" as another pertinent factor in the impropriety analysis).

CSG also appears to argue that GE Capital's interference was improper, because GE Capital did not have a legal right to redirect payments to Coastal Recovery Corporation until June 26, 2005, the termination date for the parties' Collection Agreement stated in the Notice of Termination. *See id.* (a party does not improperly interfere with another's contract by exercising its own legal rights). The May 27, 2005, Notice of Termination apparently did state that termination of the parties' Collection Agreement would be effective June 26, 2005. Nevertheless, GE Capital could have reasonably believed that it had the legal right to recall all accounts prior to that date and to place them with another entity pursuant to § 2.4 of the Collection Agreement, which provides, in subsection (a), that "[n]otwithstanding any provision herein to the contrary, GE Capital shall have the absolute right to recall any Account placed with Contractor any time, for any reason, in its sole discretion, with or without cause," and in subsection (b), that "GE Capital, in its sole discretion, may place Recalled Accounts with any other Person." Defendant's Appendix at 19 (Defendant's Exhibit G, Collection Agreement at 5, § 2.4). Certainly, nothing about actions apparently within GE Capital's legal rights under the Collection Agreement, taken to protect GE Capital's financial interest in recovery of delinquent debts through the proper entity, can amount to improper interference. *See Green*, 713 N.W.2d at 744 (considering "[t]he nature of the conduct" and "[t]he interest sought to be advanced by the Defendant").

24

The analysis above leaves only "[t]he Defendant's motive" to be considered. *See id.* (considering "[t]he Defendant's motive" as a pertinent factor in the "impropriety" analysis). Even if a tortfeasor's motive for allegedly tortious interference with a contract requires intensive fact finding, as CSG contends, the party resisting summary judgment must go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial" on the issue of GE Capital's motive. FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324. CSG has not done so here. Specifically, the June 13, 2005, letter that purportedly demonstrates GE Capital's improper motive contains nothing that a reasonable juror could find was "disparagement" of CSG—at least so far as the court has been made aware of that letter's contents.[5] Rather, that letter simply notified GE Capital's "business partners" that CSG "[wa]s no longer authorized to collect on behalf of GE," and added, "Please direct all questions to Coastal Recovery Corporation at (800) 431-2833" and "Please remit any payment to Coastal Recovery Corporation, 180 South Broadway, White Plains, NY 10605." The letter apparently did not state any reason, let alone a disparaging one, for GE Capital's termination of one debt collector and use of another. Thus, nothing but CSG's speculation suggests that the letter was intended to disparage CSG. As the Iowa Supreme Court has explained, in the context of allegations concerning the motive for allegedly tortious interference with a contract, "Speculation . . . is not evidence and a case should not be submitted to a jury for deliberation when no evidence has been presented." *Willey v. Riley*, 541 N.W.2d 521, 527 (Iowa 1995) (citing *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 800 (Iowa 1984)). CSG also seems to argue that, because the letter interfered with its contractual or prospective contractual relationships

---

[5]Again, the letter itself is not part of the summary judgment record.

Case 1:06-cv-00033-MWB   Document 36   Filed 04/26/07   Page 25 of 30

with third parties, it must have been *intended* to do so. Even assuming that GE Capital intended to interfere with CSG's contractual or prospective contractual relationships—at least to the extent that GE Capital intended that third parties affected by the termination of the Collection Agreement between CSG and GE Capital would redirect payments owed to GE Capital to an entity other than CSG—that intentional interference was, as explained above, devoid of any impropriety, where it was intended to protect GE Capital's financial interests. *See Green*, 713 N.W.2d at 744 ("The intent to interfere with a contract does not make the interference improper," because "conduct is generally not improper if it was merely a consequence of actions taken for a purpose other than to interfere with a contract") (citing *Berger*, 543 N.W.2d at 599, in turn citing Restatement (Second) of Torts § 767 cmt. d (1979)). A reasonable juror simply could not draw any inference of improper motive from the contents or timing of the June 13, 2005, letter.

In short, the record gives rise to no reasonable inferences that GE Capital acted "improperly" under the standard for tortious interference with an existing contract. In the absence of a genuine issue of material fact on this essential element of CSG's claim of tortious interference with existing contracts, GE Capital is entitled to summary judgment on that claim. *See Celotex Corp.*, 477 U.S. at 323 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law").

### 3. *Application of the higher standard*

Just as—indeed, because—there is no evidence generating genuine issues of material fact that GE Capital acted "improperly" in allegedly interfering with CSG's *existing* contractual relationships, there is certainly no evidence generating genuine issues of material fact that GE Capital "'intended to financially injure or destroy'" CSG, the higher standard on a claim of tortious interference with *prospective or potential* contractual or

26

business relationships. *See, e.g., Blumenthal Inv. Trusts*, 636 N.W.2d at 269 (quoting *Iowa Coal Mining Co., Inc.*, 555 N.W.2d at 438); *Compiano*, 588 N.W.2d at 464 (a defendant's conduct is improper, for purposes of a claim of interference with a prospective contract or business relationship, only if it is undertaken with "*the sole or predominant purpose* to injure or financially destroy" another) (emphasis added). CSG's failure to generate a genuine issue of material fact on this essential element of its claim of tortious interference with prospective or potential contractual or business relationships means that GE Capital is also entitled to summary judgment on such a claim. *See Celotex Corp.*, 477 U.S. at 323 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law").

### E.  GE Capital's Liability For Actions Of CSG's Replacement

Finally, GE Capital argues that it cannot be directly or vicariously liable for any acts of Coastal Recovery Corporation, the company that GE Capital hired to pursue delinquent accounts after terminating its contract with CSG—if CSG is now asserting that Coastal Recovery Corporation's actions support CSG's tortious interference counterclaim against GE Capital—because there are no allegations or evidence that Coastal Recovery Corporation is an entity for which GE Capital would have direct or vicarious liability. CSG contends that GE Capital could be directly and/or vicariously liable for interference by Coastal Recovery Corporation, because CSG contends that it has produced evidence that GE Capital directed Coastal Recovery Corporation to correspond with current and prospective contacts of CSG for the purpose of disparaging CSG and terminating any relationship those contacts might have with CSG. CSG also argues that GE Capital is not entitled to summary judgment on its liability for Coastal Recovery Corporation's conduct,

27

because the nature of the relationship between GE Capital and Coastal Recovery Corporation is a question of fact that should go to a jury. CSG contends that the correspondence that Coastal Recovery Corporation disseminated could lead a reasonable factfinder to conclude that Coastal Recovery Corporation was an agent of GE Capital. The court finds that CSG has also failed to generate a genuine issue of material fact on GE Capital's liability for any actions by Coastal Recovery Corporation.

First, the court has no idea what evidence CSG believes it has produced showing that GE Capital directed Coastal Recovery Corporation to correspond with current and prospective contacts of CSG for the purpose of disparaging CSG and terminating any relationship those contacts might have with CSG. Instead, CSG appears to rely entirely on speculation that there was any direction from GE Capital to Coastal Recovery Corporation to disparage CSG, not merely direction to Coastal Recovery Corporation to attempt to collect debts and to receive payments that had formerly been CSG's responsibility. As noted above, "[s]peculation . . . is not evidence and a case should not be submitted to a jury for deliberation when no evidence has been presented." *Willey*, 541 N.W.2d at 527 (citing *Harsha*, 346 N.W.2d at 800). Moreover, even apparent agency, for purposes of establishing liability of a principal for acts of another, depends upon evidence of what the *principal* did, not evidence of what the *purported agent* did. *See, e.g., Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 493 (Iowa 2000) ("Apparent authority is authority which, although not actually granted, has been knowingly permitted by the principal or which the principal holds the agent out as possessing. Apparent authority must be determined by what the principal does, rather than by any acts of the agent.") (internal citations omitted). CSG has presented no evidence of GE Capital's conduct from which an inference would arise that Coastal Recovery Corporation

28

acted as GE Capital's agent for any purpose other than collection of the debts for which CSG had formerly been responsible.[6]

Thus, on the present record, CSG has failed to generate any genuine issues of material fact on GE Capital's liability for any conduct of Coastal Recovery Corporation. Therefore, GE Capital is entitled to summary judgment on any claim that it is liable for any actions of Coastal Recovery Corporation. *See Celotex Corp.*, 477 U.S. at 323 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law").

### III. CONCLUSION

The court finds that CSG has failed to generate any genuine issues of material fact that GE Capital's alleged interference with CSG's existing and prospective contractual and business relationships was "improper" or "wrongful," as it must do to defeat GE Capital's motion for partial summary judgment on CSG's counterclaim for tortious interference with existing or prospective contracts or business relationships. That being the case, the court does not reach any of the other grounds that GE Capital has raised for partial summary judgment on that counterclaim.

THEREFORE, GE Capital's October 23, 2006, Motion For Partial Summary Judgment On Defendant's Counter-Claim For Tortious Interference With Contract And

---

[6]Indeed, CSG's own contract with GE Capital to collect debts on behalf of GE Capital purported to make CSG an "independent contractor," not an "agent" of GE Capital. *See* Defendant's Appendix at 32 (Defendant's Exhibit G, Collection Agreement at 18, § 10.1).

Case 1:06-cv-00033-MWB   Document 36   Filed 04/26/07   Page 29 of 30

Business Relations (docket no. 17) is **granted**.  CSG's tortious interference counterclaim will not be submitted to the jury.

       **IT IS SO ORDERED.**

       **DATED** this 26th day of April, 2007.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA